IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| J.L. FRENCH AUTOMOTIVE CASTINGS, INC.,[1] | ) | Case No. 06- lo ll9(     ) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

**MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER UNDER 11 U.S.C. §§ 363, 364, 1107 AND 1108 (I) AUTHORIZING (A) CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, (B) MAINTENANCE OF EXISTING BANK ACCOUNTS, (C) CONTINUED USE OF EXISTING BUSINESS FORMS AND (D) CONTINUED USE OF EXISTING INVESTMENT GUIDELINES; AND (II) (A) GRANTING SUPERPRIORITY AND ADMINISTRATIVE PRIORITY STATUS TO POSTPETITION INTERCOMPANY CLAIMS AND (B) AUTHORIZING CONTINUED PERFORMANCE UNDER INTERCOMPANY ARRANGEMENTS AND HISTORICAL PRACTICES**

The above-captioned debtors and debtors-in-possession (collectively, the

"Debtors") move the Court for entry of an order (i) authorizing the Debtors to (a) continue to use

their existing cash management system, (b) maintain existing bank accounts, (c) continue to use

their existing business forms and (d) continue to use their existing investment guidelines; and

(ii) (a) granting superpriority and administrative priority status to postpetition intercompany

claims and (b) authorizing the Debtors to continue to perform under certain intercompany

---

[1] The Debtors are: J.L. French Automotive Castings, Inc., Nelson Metal Products Corporation, Allotech International Inc., Shore Line Industries, Inc., J.L. French Automotive LLC, French Holdings, Inc., J.L. French Corporation, J.L. French Automotive Castings New York, Inc., J.L. French Automotive Castings Illinois, Inc.

arrangements and historical practices. In support of this motion, the Debtors respectfully state as follows:[2]

## Jurisdiction

1.     This Court has jurisdiction over this motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of these proceedings and this motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory bases for the relief requested herein are sections 105(a), 363, 364, 507, 1107 and 1108 of title 11 of the United States Code, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (the "Bankruptcy Code").

## Background

3.     On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The Debtors are operating their businesses and managing their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner or statutory committee has yet been appointed in these Chapter 11 Cases.

4.     The other facts and circumstances further supporting this motion are more fully set forth in the First Day Affidavit.

---

[2]    The facts and circumstances supporting this Motion are set forth in the Affidavit of James Amodeo, Chief Financial Officer of J.L. French Automotive Castings, Inc. in Support of First Day Motions (the "First Day Affidavit"), filed contemporaneously herewith.

**The Prearranged Plan**

5.    In conjunction with filing these Chapter 11 Cases, the Debtors have entered into a restructuring support agreement (the "Restructuring Support Agreement) with certain holders (the "Second Lien Noteholders") of the Debtors' prepetition second priority lien claims (an estimated $170 million), whereby the Second Lien Noteholders have agreed to support a chapter 11 plan of reorganization (the "Plan") contemplated by the plan term sheet (the "Plan Term Sheet") attached to the Restructuring Support Agreement.  Under the Plan Term Sheet's terms, the Second Lien Noteholders will receive 8-22% of the equity of Reorganized J.L. French.  The balance of Reorganized J.L. French's common equity will be purchased by certain of the Second Lien Noteholders who subscribe to a rights offering for between $110 and $130 million in cash (the "New Money Investment")

6.    As set forth more fully in the First Day Affidavit, the Second Lien Noteholders are secured by a second lien on substantially all of the prepetition assets of the Debtors.  They are contractually subordinated to the liens of the holders (the "First Lien Holders") securing their claims (the "First Lien Claims") of approximately $295 million in principal and other unpaid interest and fees.  The New Money Investment, when combined with the proceeds of a contemplated exit financing credit facility, will satisfy the First Lien Claims, repay certain post-petition borrowings under a DIP facility, and satisfy all administrative expenses and section 507(a) priority claims.

7.    The Second Lien Noteholders' projected recoveries are estimated to be less than 20%.  As a result, general unsecured creditors will not be entitled to receive any distributions from any of the Debtors upon confirmation of a chapter 11 plan of reorganization.

The Plan therefore classifies all of its general unsecured creditors in a single class that will

receive no distributions, and which, pursuant to section 1126(g) of the Bankruptcy Code, will be

deemed to have rejected the Plan.

        8.      The Second Lien Noteholders' New Money Investment is predicated on

the Company being able to maintain its customer commitments. Those customer commitments

are in turn dependent on the Debtors maintaining both financial as well as operational stability.

With such stability in mind, the Second Lien Noteholders and the Company, as set forth in the

Plan Term Sheet, contemplate that the Company will continue to operate in the ordinary course

of business during and subsequent to these Chapter 11 Cases. The Plan Term Sheet therefore

also contemplates that the Debtors will pay, in the ordinary course of business, the prepetition

claims of trade vendors, suppliers, and service providers. The Debtors are seeking approval for

such prepetition payments in the *Motion Of The Debtors For Entry Of An Order Granting The*

*Debtors Authority To Provisionally Pay Trade Creditors In The Ordinary Course Of Business*

(the "Ordinary Course Trade Motion"), filed concurrently herewith.

### The Debtors' Cash Management System

        9.      In the ordinary course of business, the Debtors maintain eight primary (8)

bank accounts at various banks throughout the United States, through which J.L. French

Corporation manages cash receipts, transfers and disbursements for the Debtors' entire domestic

corporate enterprise (the "Cash Management System"). Each of these accounts is described in

detail below and in the flow chart of the Cash Management System attached as Exhibit A. The

Debtors routinely deposit, withdraw, and otherwise transfer funds to, from, and between such

accounts by various methods, including checks, electronic funds transfers and direct deposits.

All of the bank accounts are maintained by financially stable banking institutions with Federal

Deposit Insurance Corporation ("FDIC") or Federal Savings and Loan Insurance Corporation

("FSLIC") insurance or other appropriate government guaranteed deposit protection insurance

(e.g., CDIC insurance).

      10.    The Debtors' foreign non-debtor affiliates generally maintain their own

cash management systems and bank accounts.  However, as referenced in the debtor-in-

possession financing agreement (attached as Exhibit A to the Debtors' *Motion for Interim and*

*Final Orders (i) Authorizing Debtors to (a) Obtain PostpetitionSsecured Financing and (b)*

*UtilizeCash Collateral; (ii) Granting Adequate Protection toPrepetition Secured Parties; and*

*(iii) Scheduling Final Hearing)* (the "DIP Agreement"), the Debtors anticipate funding certain

foreign operations after the Petition Date, including the Debtors' operations in Spain and a joint

venture operation that the Debtors are pursuing in China.  This funding was specifically

negotiated, and is expressly accounted for in the DIP Agreement.  Funds drawn from the DIP

Agreement and intended for use in the Debtors' foreign operations will necessarily need to be

funneled through the Debtors' domestic cash management system.  Therefore, although the

Debtors are only requesting relief relating to their cash management system maintained in the

United States, the domestic Cash Management System necessarily has some overlap with the

Debtors' foreign subsidiaries due to such intercompany transactions in the ordinary course of

business.  Therefore, the Debtors request relief in scope sufficient to include transactions

between the Debtors' Cash Management System and the cash management systems of its foreign

subsidiaries that relate to debtor-in-possession financing or occur in the ordinary course of business.

11.     Specifically, the Debtors' Cash Management System consists of: (i) a depository account maintained by Wells Fargo Bank, N.A. ("Wells Fargo"), with J.L. French Corporation as the account debtor; (ii) numerous disbursement accounts maintained by JP Morgan Chase, Wells Fargo, and Branch Banking & Trust; (iii) a "lockbox" account located at Wells Fargo Bank, Minneapolis, Minnesota (the "Minnesota Lockbox"); and (iv) a joint trust account maintained by Wells Fargo Trust Services in Minneapolis, Minnesota. The cash management system also includes a revolving credit facility (the "Credit Revolver") with General Electric Capital Corporation ("GE"), as well as two money market accounts (the "Investment Accounts"), which are linked to two of the Debtors' main accounts maintained by Wells Fargo.

12.     The principal components of the Debtors' current consolidated cash management system are as follows:

a.     The Debtors' Main Operating Account:  Proceeds from purchases by customers of J.L French Corporation are deposited into a depository account at Wells Fargo, Account No. 4121057608, with J.L. French Corporation as the account holder (the "Main Operating Account").  Over ninety-five percent (95%) of deposits to the Main Operating Account originate from wire transfers, with the remaining deposits coming from accounts receivable checks and other miscellaneous deposits, including deposits from a lockbox account. Disbursements made from the Main Operating Account include (i) payment of accounts payable checks; (ii) payment of accounts payable wire transfers; (iii) payment of taxes; (iv) payment of

Automated Clearing House transfers; (v) payment of employee payroll direct deposits; (vi)

payment of employee payroll tax withholdings; (vii) payment of employee payroll wage

garnishments; and (viii) 401k payments. The account is also used as an automatic clearing house

("ACH") fraud filter, in connection with third parties who have privileges to conduct ACH

transactions with the Debtors' bank accounts for employees' direct deposit, medical prescription,

and dental insurance expenses. In addition, on a daily or weekly basis, money from the Main

Operating Account is internally transferred as necessary to the Debtors' other accounts (together

with the Main Operating Account, the "Operating Accounts"), as described below. The Main

Operating Account has an attached Money Market account for the overnight investment of

excess cash.

        b.     Allotech Account: Allotech International, Inc. ("Allotech"),

located in Sheboygan, Wisconsin, maintains an account at Wells Fargo Bank, Account No.

4121064620 (the "Allotech Account"). In addition to proceeds from purchases by customers of

Allotech, which are deposited into the account, this account is funded daily by a transfer from the

Main Operating Account. This money is used by Allotech to purchase raw materials, which it

then manufactures into products purchased by J.L. French Corporation.

        c.     Allotech Payroll Account: Allotech maintains another account at

Wells Fargo Bank, Account No. 4900806188 (the "Allotech Payroll Account") to cover payroll

expenses for employees of Allotech International, Inc. This account is funded primarily by a bi-weekly $35,000 - 40,000 intercompany payment originating from the Main Operating Account.[3]

    d. Benton Harbor Primary Account: The Debtors maintain an account at JP Morgan Chase, Account No. 890000085030, (the "Benton Harbor Primary Account") under Shore Line Industries, Inc., which is primarily funded by an approximately $120,000 weekly intercompany payment originating from the Main Operating Account. Disbursements made from the Benton Harbor Primary Account include payment of accounts payable checks and payroll checks for employees of Shore Line Industries, Inc.

    e. J.L.F-Glasgow Account: The Debtors maintain an account at Branch Banking & Trust ("BB&T"), in Delaware, Account No. 5181349648, under Nelson Metal Products Corporation (the "J.L.F-Glasgow Account"). This account is funded from the Main Operating Account, and is used for payroll expenses for employees of Nelson Metal Products Corporation.

    f. NMPC Account: The Debtors maintain an account at Wells Fargo, Account No. 4121064638, under Nelson Metal Products Corporation (the "NMPC Account"), which is funded by the Debtors' Main Operating Account. Disbursements include accounts payable checks. The NMPC Account has an attached Money Market account for the overnight investment of excess cash.

---

[3] The Debtors endeavor to maintain accounts with local banks upon which employee payroll checks may be drawn to ensure that their employees without bank accounts are able to cash their paychecks without a fee.

g.    JLFC Sheboygan Hourly Payroll Account: The Debtors maintain an account at Wells Fargo, Account No. 4900811238, (the "JLFC Sheboygan Hourly Payroll Account") under J.L. French Corporation, which is funded by the Debtors' Main Operating Account. Disbursements from this account include hourly payroll expenses for employees of J.L. French Corporation.

h.    The JLFR A/R Factoring Account: The Debtors' non-debtor affiliate JLFR, Inc. maintains an account at Wells Fargo Bank, N.A., Account No. 4121044838, for use in an account purchase program, under which Wells Fargo purchases certain of the Debtors' outstanding accounts receivable from JLFR, Inc.[4]

i.    The Debtors' Holding Account: Limited funds from the Operating Accounts are transferred into an account held by J.L. French Automotive Castings, Inc. at Wells Fargo Bank, Account No. 4121058366 (the "Holding Account") to be used for (i) payment on senior bank debt; (ii) payment on subordinated bank debt; (iii) payment of professional fees (e.g., auditors, attorneys); (iv) payment of occasional intercompany loans to non-debtor foreign subsidiaries; and (v) miscellaneous payments. Any funds drawn from the Debtors' revolving credit line (described below) are also deposited into this account.

j.    The Debtors' Money Market Accounts: The Debtors maintain two money market accounts – one linked to the Main Operating Account and one linked to the

---

[4]    For additional information regarding the Wells Fargo account purchase agreement, see the *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Continue Performing Under the Wells Fargo Accounts Receivable Purchase Program and (II) Authorizing the Debtors to Grant Security Interests Pursuant to 11 U.S.C. §§ 364(c) in Accounts Sold Under the Program*, which was filed concurrently herewith.

NMPC Account – as described above. The Money Market Accounts bear the same account number as the accounts to which they are linked. Rather than permitting excess funds in the Main Operating Account and the NMPC Account, such funds are transferred each day into the Money Market Accounts. The funds remain invested, earning interest, in the Money Market Account overnight, and are transferred back to the Main Operating Account and the NMPC Account each morning.

              k.      <u>Joint Trust Account</u>: Finally, the Debtors maintain a joint trust account with Wells Fargo Trust Services in Minneapolis, Minnesota, Escrow Account No. 18221500, in which Allotech International, Inc. is the Principal and Ocean Manufacturing, Inc. is the Distributor. Wells Fargo acts as Escrow Agent for the account and Ocean Manufacturing, Inc. is one of the Debtors' minority aluminum suppliers. Each month certain of the Debtors' customers submit payments to the Joint Trust Account and, after written authorization from both the Principal and the Distributor, the Escrow Agent doles out the Joint Trust Account funds. Approximately 99.5% goes to Allotech International, Inc. and the remaining 0.5% to Ocean Manufacturing, Inc. Typical monthly disbursements are approximately $40,000, and are deposited into the Allotech Account, described above.

            13.     The Debtors also have a $70 million prepetition revolving credit line with General Electric Capital Corporation ("GE"), as agent for the first lienholders (the "Credit Revolver"). Historically, the Debtors could draw funds from the Credit Revolver, deposit those funds into the Debtors' Holding Account, and direct such funds to the deficient Operating Account(s) to cover necessary disbursements. The Debtors can no longer utilize the Credit Revolver, however, as they have drawn their entire credit line to fund current operations.

14.     A schedule identifying all of the Debtors' prepetition bank accounts

(collectively, the "Prepetition Bank Accounts"), including the accounts described above, is

attached as Exhibit B.

**Relief Requested**

15.     The Debtors' businesses and financial affairs are complex by nature,

requiring the collection, disbursement and movement of funds through numerous bank accounts.

The Office of the United States Trustee for the District of Delaware has established certain

operating guidelines for debtors-in-possession to supervise the administration of chapter 11

cases, including changes to the debtor's prepetition cash management system. These guidelines

require debtors to, among other things, establish one debtor-in-possession account for all estate

monies required for the payment of taxes (including payroll taxes), close all existing bank

accounts and open new debtor-in-possession accounts, maintain a separate debtor-in-possession

account for cash collateral, and obtain checks that bear the designation "debtor-in-possession,"

referencing the bankruptcy case number and the type of account on such checks. Enforcement of

these guidelines in these Chapter 11 Cases, however, would severely disrupt, and likely cripple,

the Debtors' ordinary financial operations. As described above, the Debtors contract with

numerous third-party vendors, service providers, and trade creditors to fulfill customer

obligations and any interruption in payments made to those third-parties could jeopardize the

Debtors' efforts to reorganize.

16.     Accordingly, by this motion, the Debtors request authority to continue to

use their existing cash management system, maintain their existing bank accounts, continue to

use existing business forms and continue to use their existing investment guidelines. The

Debtors further request that superpriority and administrative priority status be granted to certain

of their intercompany claims and that they be allowed to continue to perform under certain

intercompany arrangements and historical practices.

## Basis For Relief

A.    **Continuing the Debtors' Integrated Cash Management Is in the Best Interests of the Debtors' Estates and Creditors.**

17.    The United States Trustee generally requires a debtor-in-possession to

close all prepetition bank accounts and open new debtor-in-possession bank accounts. In

addition, the United States Trustee may require a debtor-in-possession to maintain separate

accounts for cash collateral and taxes. However, in complex chapter 11 cases, such as here,

courts in this and other districts often waive these requirements, recognizing that they are often

impractical and potentially detrimental to a debtor's postpetition business operations and

restructuring efforts.[5]

18.    By this motion, the Debtors seek authority to continue utilizing their

current integrated cash management system, as described herein. It is, in fact, critical that they

continue to consolidate their cash management and centrally coordinate fund transfers in order to

efficiently and effectively operate their large, complex business operations. Substantially

disrupting these cash management procedures would severely impair the Debtors' ability to

---

[5]    See, e.g., In re Pliant Corporation, Case No. 06-10001 (Bankr. D. Del. January 4, 2006) (MFW); In re Exide Techs., Case No. 02-11125 (Bankr. D. Del. April 17, 2002); In re W. R. Grace & Co., Case No. 01-01139 (Bankr. D. Del. April 2, 2001); In re Trans World Airlines, Inc., Case No. 01-00056 (Bankr. D. Del. January 10, 2001).

preserve and enhance their respective going concern values and to successfully reorganize during these Chapter 11 Cases. Moreover, creating an entirely new cash management system would inevitably have a deleterious effect on the Debtors' recordkeeping -- which would subvert the goal of the United States Trustee Guidelines (as defined herein). It is essential, therefore, that the Debtors be permitted to continue to use their current Cash Management System.

19.    The current structure of the Debtors' Cash Management System was put in place as part of the Debtors' 2004 refinancing and recapitalization agreements with GE (as agent for the first lienholders' credit facility), Goldman Sachs Credit Partner, LP (as agent for the second lienholders' credit facility) and Wells Fargo. The Cash Management System is similar in form to those commonly employed by corporate enterprises comparable to the Debtors in size and complexity. Large, complex, multiple-entity businesses tend to use such systems because of the numerous benefits they provide, including the ability to (a) accurately track, and thus control, all corporate funds through an ability to provide near-continuous status reports on the location and amount of all such funds, (b) ensure cash availability and (c) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information. These controls are particularly important here, given the significant amount of cash that flows through the Debtors' integrated cash management system.

20.    In addition, given the corporate and financial structure of the Debtors and their non-debtor affiliates, it would be difficult for the Debtors to establish an entirely new system of accounts and a new cash management system for each separate legal entity. For example, as described in more detail below, if the Debtors were required to open separate accounts as debtors-in-possession and rearrange their Cash Management System, it would

necessitate opening numerous new accounts for collections, cash concentration and

disbursements. The delays that would result from opening new accounts, revising cash

management procedures and instructing customers to redirect payments would disrupt the

Debtors' business operations while pursuing these arrangements, at a time when customers and

vendors are closely scrutinizing the Debtors for deviations from "business as usual."

Additionally, GE, the Debtors' prospective debtor-in-possession lender (and agent for the first

lien noteholders), is quite familiar with, and has expressed reservations about changes to, the

Debtors' existing Cash Management System. Thus, under the circumstances, maintaining the

Debtors' Cash Management System is both essential and in the best interests of their respective

estates and creditors.[6] Furthermore, preserving the "business as usual" atmosphere and avoiding

the unnecessary distractions that would inevitably be associated with any substantial disruption

in the Debtors' Cash Management System will facilitate the Debtors' efforts to effectuate a

speedy and prearranged plan of reorganization.

       21.     Bankruptcy courts, including courts in this district, routinely grant chapter

11 debtors authority to continue utilizing existing cash management systems and treat requests

for such authority as a relatively "simple matter." In re Nobex Corporation, Case No. 05-20050

(MFW) (Bankr. D. Del., Dec. 6, 2005); In re FLYi, Inc., Case No. 05-20011 (MFW) (Bankr. D.

Del. Nov. 7, 2005); In re AstroPower, Inc., Case No. 04-10322 (MFW) (Bankr. D. Del. 2004); In

re The Thaxton Group, Inc., Case No. 03-13183 (PJW) (Bankr. D. Del. 2003); In re Orion

---

[6]    Of course, the Debtors will continue to maintain records with respect to transfers of cash, so that transactions can be ascertained, traced and recorded properly on applicable intercompany accounts

Refining Corp., Case No. 03-11483 (MFW) (Bankr. D. Del. 2003); In re Philip Services Corp.,

Case No. 99-2385 (MFW) (Bankr. D. Del. June 25, 1999); In re Favorite Brands Int'l Holding

Corp., Case No. 99-726 (PJW) (Bankr. D. Del. Mar. 31, 1999).  This is particularly true where,

as here, a chapter 11 case involves affiliated debtors with complex financial affairs.  In In re

Charter Co., 778 F.2d 617 (11th Cir. 1985), for example, the Bankruptcy Court entered an order

authorizing the debtor and forty-three (43) of its subsidiaries "to continue to consolidate the

management of their cash as has been usual and customary in the past, and to transfer monies

from affiliated entity to entity, including operating entities that are not debtors."  Id. at 620.  The

Eleventh Circuit Court of Appeals then affirmed a subsequent District Court decision denying a

creditor's motion for leave to appeal the Bankruptcy Court's cash management order, holding

that authorizing the debtors to utilize their prepetition "routine cash management system" was

"entirely consistent" with applicable provisions of the Bankruptcy Code.  Id. at 621.

   22.  Likewise, in another context, the Columbia Gas bankruptcy court

explained that an integrated cash management system "allows efficient utilization of cash

resources and recognizes the impracticability of maintaining separate cash accounts for the many

different purposes that require cash."  In re Columbia Gas Sys., Inc., 136 B.R. 930, 934 (Bankr.

D. Del. 1993), aff'd in part and rev'd in part, 997 F.2d 1039 (3d Cir. 1993), cert. denied sub nom

Official Comm. of Unsecured Creditors v. Columbia Gas Transmission Corp., 114 S. Ct. 1050

(1994).  The Third Circuit agreed, emphasizing that a requirement to maintain all accounts

separately "would be a huge administrative burden and economically inefficient."  Columbia

Gas, 997 F.2d at 1061; see also In re Southmark Corp., 49 F.3d 1111, 1114 (5th Cir. 1995) (cash

management system allows debtor "to administer more efficiently and effectively its financial operations and assets").

23.    Based upon the foregoing, it is appropriate and entirely consistent with applicable provisions of the Bankruptcy Code and case law for the Court to approve the Debtors' continued use of their integrated Cash Management System in its current form.  Indeed, if the Debtors are not permitted to continue to utilize their integrated Cash Management System in its current form, their operations would be severely, and perhaps irreparably, impaired.  The Court should, therefore, authorize the Debtors' continued use of their existing Cash Management System.

**B.**    **The Debtors Should Be Authorized to Maintain Their Existing Bank Accounts.**

24.    As previously noted, The United States Trustee for the District of Delaware has established certain operating guidelines for debtors-in-possession.  For example, the guidelines require a chapter 11 debtor-in-possession to open new bank accounts and close all existing accounts.  The Guidelines further require that the new bank accounts only be opened in certain financial institutions designated as authorized depositories by the United States Trustee. These requirements are designed to provide a clear line of demarcation between prepetition and postpetition claims and payments and to help protect against the Debtor's inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the Petition Date.

25.    Before the Petition Date, the Debtors, in the ordinary course of business, maintained approximately eight (8) operational accounts, each of which is listed in the attached Exhibit B (collectively, the "Bank Accounts").  Some of these Bank Accounts are located at

financial institutions other than those that the United States Trustee has designated as authorized depositories. The Debtors' main operating Bank Accounts are described in considerable detail above.

26.    The Debtors seek a waiver of the United States Trustee's requirement that the Bank Accounts be closed and that new postpetition bank accounts be opened at authorized depositories. If enforced in these Chapter 11 Cases, this requirement would cause enormous disruption in the Debtors' businesses and would impair their efforts to reorganize.

27.    Specifically, the Debtors would be subject to significant administrative burdens and expenses if they were required to close and reopen new accounts, execute new signatory cards and/or depository agreements, and create an entirely new manual system for issuing checks and paying postpetition obligations, as generally required by the Office of the United States Trustee. For example, the Debtors believe that Wells Fargo, Branch Banking & Trust, and JP Morgan Chase (each of which maintains one or more of the Debtors' bank accounts) all require up to two weeks to open and activate new accounts. Because the Debtors use only one primary depository account to fund their many disbursement accounts, and the establishment of a new depository account (with Wells Fargo or another bank) could take up to two (2) weeks, there is no doubt that Debtors would experience severe delays in receiving the cash necessary to operate their businesses as debtors-in-possession. This, along with the error and confusion likely to result from such a significant change, could irreparably harm the Debtors, their estates and their creditors by creating cash flow interruptions while accounts were changed. Therefore, to avoid delays in paying debts incurred postpetition, and to ensure as smooth a transition into chapter 11 as possible, the Debtors should be permitted to continue to maintain the

existing Bank Accounts and, if necessary, to open new accounts and close existing accounts in the normal course of business operations.

28.    In other large cases, this Court has waived the strict enforcement of bank account closing requirements and replaced them with an alternative cash management procedure that provides the same protection. See, e.g., In re Pliant Corporation, Case No. 06-10001 (Bankr. D. Del. January 4, 2006) (MFW); In re Nobex Corporation, Case No. 05-20050 (MFW) (Bankr. D. Del., Dec. 6, 2005); In re FLYi, Inc., Case No. 05-20011 (MFW) (Bankr. D. Del. Nov. 7, 2005).  Furthermore, permitting the Debtors to continue to use the Prepetition Bank Accounts will not prejudice creditors because the Debtors have the capability, through their internal accounting system, to distinguish clearly between prepetition and postpetition obligations and payments without closing existing accounts and opening new ones.  To guard against improper transfers resulting from the postpetition honoring of prepetition checks, the Court can order the Debtors' banks, with some exceptions, not to honor any checks drawn on the Debtors' accounts before the Petition Date.

29.    The Debtors represent that if the relief requested herein is granted, they will implement appropriate mechanisms to ensure that no payments will be made on any debts they incurred before the Petition Date, other than those authorized by this Court.

30.    Accordingly, the Debtors request that this Court waive the United States Trustee's bank account closing requirements and instead simply require the Debtors to implement appropriate mechanisms to ensure they will not inadvertently pay any prepetition obligations. The Debtors further request that the Bank Accounts be deemed debtor-in-possession accounts and that the Debtors be authorized (subject to the discussion in Section III, below) to

maintain and continue using these accounts in the same manner and with the same account

numbers, styles and document forms as those employed during the prepetition period.

**C.      The Debtors Should Be Authorized to Use Existing Business Forms and Checks.**

31.      In the ordinary course of their businesses, the Debtors use a multitude of

checks and other business forms.  To minimize expenses to the estates, the Debtors request

authority to continue to use all correspondence and business forms (including, but not limited to,

letterhead, purchase orders, invoices, etc.) as such forms were in existence immediately before

the Petition Date, without reference to the Debtors' status as debtors-in-possession.  The Debtors

also request authorization to use their existing check stock, provided, however, as soon as

practicable the Debtors will imprint the legend "DIP" on such existing checks.  In accordance

with Del Bankr. L.R. 2015-2(a), upon depletion of the Debtors' check stock and/or business

forms stock, the Debtors will obtain new check stock and/or business forms stock reflecting their

status as debtors-in-possession.

32.      By virtue of the nature and scope of the Debtors' business operations and

the large number of suppliers of goods and services with whom the Debtors deal on a regular

basis, it is important that the Debtors be permitted to continue to use their existing checks and

other business forms without alteration or change, except as requested herein.  Indeed, because

parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as a

debtor-in-possession as a result of the large and highly publicized nature of these Chapter 11

Cases, changing business forms is unnecessary and unduly burdensome.

33.    In other large cases, this Court has allowed debtors to use their prepetition

check forms without the "debtor-in-possession" label, at least until the debtors' existing check

stock was depleted.  See, e.g., In re Nobex Corporation, Case No. 05-20050 (MFW) (Bankr. D.

Del., Dec. 6, 2005); In re FLYi, Inc., Case No. 05-20011 (MFW) (Bankr. D. Del. Nov. 7, 2005);

In re AstroPower, Inc., Case No. 04-10322 (MFW) (Bankr. D. Del. 2004).

**D.    The Debtors Should Be Authorized to Continue Using Debit, Wire and Automatic Clearing House Payments.**

34.    The Debtors should be granted further relief from the United States

Trustee's guidelines to the extent that they require the Debtors to make all disbursements by

check.  In particular, the United States Trustee's guidelines require that all receipts and all

disbursements of estate funds be by check with a notation representing the reason for the

disbursement.

35.    Considering the complexity of the Debtors' operations, and their historical

practice of using electronic fund transfers, it is necessary for the Debtors to continue to conduct

transactions by debit, wire or ACH payments and other similar methods, as discussed above.  In

addition, a substantial portion of the Debtors' customers' receipts are received through wire.  To

deny the Debtors the opportunity to conduct transactions by debit, wire or ACH payments or

other similar methods would substantially interfere with the Debtors' performance of their

obligations, negatively impacting liquidity and unnecessarily disrupting the Debtors' business

operations.  It would also create additional costs to the Debtors and their non-debtor affiliates.

36.    Furthermore, in the ordinary course of business, the Debtors fund the

Main Operating Account and certain Operating Accounts to issue payment for the cost of

employee medical and payroll benefits by wire and ACH transactions. For example, the Debtors

pay certain employee medical benefits (i.e., payments to Delta Dental, Walgreen Health and

Innovative Resource Group) by weekly ACH payments. Additionally, Automatic Data

Processing ("ADP") (a third-party benefit administrator that writes payroll checks on the

Debtors' behalf, as described below) also administers the Debtors' payroll obligations,

segregates tax withholdings and provides other benefits by means of ACH transactions with the

Debtors' Main Operating Account. If these practices are interrupted, it could result in a

disruption of the Debtors' payroll and employee benefits, leading to a significant erosion of the

Debtors' employees' morale.

E.    **The Debtors Should Be Authorized to Continue to Allow Third-Party Benefit
      Administrators to Write Checks on the Debtors behalf.**

            37.    In the ordinary course of business, the Debtors fund the Main Operating

Account and certain Operating Accounts for the cost of employee payroll, tax withholdings, and

other employee benefits. The Debtors provide their employees with paychecks written by ADP

and drawn on the Debtors' various accounts. ADP is authorized to complete these transactions

through ACH payments, as described above. Again, if ADP is not authorized to continue this

practice it could result in a disruption of the Debtors' employee payroll, which could lead to a

significant erosion of the Debtors' employees' morale. Because these practices are carried out in

the ordinary course of business, the Debtors do not believe their continuance requires Court

approval. However, out of an abundance of caution the Debtors seek authority to continue these

practices in order to avoid interference with the Debtors' ability to pay its employees' payroll

benefits.

F.     **Cause Exists for Waiving the Investment and Deposit Guidelines of Section 345 of the Bankruptcy Code.**

38.     Prior to the Petition Date, the Debtors invested excess cash in the Money Market Accounts overnight. The Debtors request authority to continue investing excess cash in the Money Market Accounts according to their prepetition practices.

39.     Section 345(a) of the Bankruptcy Code authorizes the deposit or investment of money of estates as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a). While section 345(b) of the Bankruptcy Code generally requires that, with respect to investments other than investments "insured or guaranteed by the United States or by a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States," the estate must require a bond in favor of the United States and secured by the undertaking of a U.S. Trustee-approved corporate surety, it allows the court to dispense with this limitation "for cause."

40.     The Court's ability to excuse strict performance of the deposit and investment requirements of section 345(b) of the Bankruptcy Code "for cause" arises from the 1994 amendments to the Bankruptcy Code, which were unchanged by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. The legislative history of that amendment provides:

> Section 345 of the Code governs investments of funds of bankruptcy estates. The purposes [sic] is to make sure that funds of a bankrupt that are obliged to creditors are invested prudently and safely with the eventual goal of being able to satisfy all claims against the bankruptcy estate. Under current law, all investments are required to be FDIC insured, collateralized or bonded. While this requirement is wise in the case of smaller debtors with limited

> funds that cannot afford a risky investment to be lost, it can work
> to needlessly handcuff larger, more sophisticated debtors.  This
> section would amend the Code to allow the courts to approve
> investments other than those permitted by section 345(b) for just
> cause, thereby overruling In re Columbia Gas Sys., Inc., 33 F.3d
> 294 (3d Cir. 1994).

In re Service Merch. Co., Inc., 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) (quoting H.R. Rep.

No. 103-834, 103rd Cong., 2nd Sess. 224 (Oct. 4, 1994); 140 Cong. Rec. H10767 (Oct. 4,

1994)).

41.     Here, the Debtors submit that cause exists for the Court to allow the

Debtors to continue investing their idle cash in accordance with their past practice. The Debtors

invest their cash with the primary goal of protecting their principal and the secondary goal of

maximizing their principal's yield and liquidity.   Specifically, excess funds in the Main

Operating Account and the NMPC Account are invested in short-term, money market investment

accounts designed to yield a higher return on idle cash with little investment risk, and then re-

deposited in the Main Operating Account and the NMPC Account on a daily basis. The Debtors

submit that the investment accounts provide sufficient protection for their cash and that it would

be in the best interest of their estates and creditors to continue this practice.

42.     The United States Trustee's guidelines limit a debtor's investment to

bonds and securities backed by the United States Government to ensure stability and provide a

'safe' investment.  The Debtors submit that their prepetition investment practices already provide

great stability, while also yielding greater returns than those resulting from investments in

government securities.  Therefore, the Debtors' current strategy could result in substantially

greater returns for the Debtors' estates over time.  Moreover, a bond secured by the undertaking

of a corporate surety would likely be unduly expensive - - assuming such a bond were available -
- and could offset much of the financial gain derived from investing in the investment accounts.
By utilizing their current investment accounts, the Debtors will fulfill the United States Trustee's
goal of safe investing by preserving capital, providing liquidity, maintaining appropriate
diversifications and generating returns relative to prevailing market conditions.

      43.    Here, the Debtors submit that the funds will not be sufficiently at risk to
necessitate strict adherence to the requirements of section 345(b) of the Bankruptcy Code.
Moreover, if granted a waiver from the United States Trustee's guidelines, the Debtors will not
avoid the significant administrative difficulties and expenses relating to opening new accounts to
ensure that all their funds are fully insured or invested strictly in accordance with the restrictions
established by section 345 of the Bankruptcy Code.

      44.    In other large chapter 11 cases, courts have liberally construed the
requirement of section 345(b) of the Bankruptcy Code that a debtor-in-possession obtain a bond
from any entity with which its money is deposited or invested. In those instances, the courts
waived the requirements of section 345(b) of the Bankruptcy Code and replaced them with
alternative procedures, such as those that the Debtors request herein. See, e.g., In re Nobex
Corporation, Case No. 05-20050 (MFW) (Bankr. D. Del., Dec. 6, 2005); In re Federal-Mogul
Global, Inc., Case No. 01-10578 (Bankr. D. Del. Oct. 4, 2001). Cause exists for a similar waiver
in these cases.

45.     In accordance with Del. Bankr. L.R. 2015-2(b) The Debtors will seek

interim relief on the waiver of the Section 345 requirements pending notice and hearing on this

aspect of the Motion.

G.     **The Court Should Grant Superpriority and Administrative Priority Status to Postpetition Intercompany Claims.**

   1.  **Description of the Debtors' Postpetition Intercompany Claims.**

46.     The Debtors maintain business relationships with each other and their non-

debtor affiliates and, as a result, there are numerous intercompany claims that reflect

intercompany receivables and payments made in the ordinary course of the Debtors' businesses

(the "Intercompany Claims"). As of December 31, 2005, the Intercompany Claims include, but

are not limited to:

- *Trade receivables and trade payables.* In the ordinary course of business, and as a result of the Debtors' Cash Management System, certain Debtors receive checks and wire transfers from customers and fund payables on behalf of various other Debtors. The Debtors' intercompany accounts reflect the net position of both receipts and disbursements received or made on behalf of other Debtors and non-debtor affiliates.

- *Centrally billed expenses.* In the ordinary course of business, the Debtors incur centrally billed expenses, such as insurance premiums, payroll, 401K payments, benefits, payroll taxes, other taxes, (e.g., real estate, franchise sales, etc.), workman's compensation obligations, and technology equipment. Technology equipment charges are charged to both Debtors and non-debtors.

- *Management fee allocation.* Charges for management services are allocated to each Debtor and non-debtor based on the cost of the service provided, directly identifiable costs and other allocation methods.

- *Direct loans.* In the ordinary course of business, both the Debtors and non-debtors make loans to each other to fund operations and make acquisitions.

- *IT cost allocation.* Cost for information technology is allocated to each Debtor and non-debtor based on the usage of the information technology, directly identifiable costs and other allocation methods.

- *Other miscellaneous items.* The Debtors and non-debtors also incur charges resulting from the booking of acquisition accounting entries.

## 2. Granting Superpriority and Administrative Priority Status to Postpetition Intercompany Claims Is Necessary to Protect the Debtors' Claims.

47.    To ensure that each individual Debtor will not fund, at the expense of its creditors, the operations of another entity, post-petition intercompany claims must be granted administrative priority expense status.[7] In many instances, the Debtors' funds are commingled throughout the Cash Management System. Accordingly, at any given time, there may be Intercompany Claims owing by one Debtor to another, as well as non-debtor affiliates. These transactions are made between and among the Debtors and certain of their non-debtor affiliates in the ordinary course of the Debtors' businesses as part of their Cash Management System (the "Intercompany Transactions"). The Debtors maintain records of all fund transfers and can ascertain, trace and account for Intercompany Transactions. The Debtors, moreover, will continue to maintain records of Intercompany Transactions. If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the detriment of the Debtors.

48.    To ensure that, after the Petition Date, each individual Debtor will not fund, at the expense of its creditors, the operations of another entity, the Debtors respectfully request that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all Intercompany Claims against a Debtor by another Debtor arising after the Petition Date, as a result of ordinary course Intercompany Transactions through the Cash Management System, be accorded

---

[7]    These post-petition intercompany claims will be subordinate to any superpriority claims that the Court may award to the Debtors' first lien and debtor-in-possession lenders pursuant to section 507 of the Bankruptcy Code.

superpriority and administrative priority expense status.  If Intercompany Claims are accorded

superpriority and administrative priority expense status, each entity utilizing funds flowing

through the Cash Management System should continue to bear ultimate repayment responsibility

for such ordinary course transactions.

        49.     To resolve concerns related to the repayment of funds moved between a

debtor and its subsidiaries in a chapter 11 case, courts typically grant administrative and

superpriority status to postpetition intercompany claims by and between the debtor entities.  See,

e.g., In re Nobex Corporation, Case No. 05-20050 (MFW) (Bankr. D. Del., Dec. 6, 2005); In re

FLYi, Inc., Case No. 05-20011 (MFW) (Bankr. D. Del. Nov. 7, 2005); In re Cornerstone

Propane, L.P., Case No. 04- 13856 (Bankr. S.D.N.Y. June 3, 2004); In re NRG Energy, Inc.,

Case No. 03-13024 (Bankr. S.D.N.Y. May 15, 2003); In re Global Crossing, Ltd., Case No. 02-

40188 (Bankr. S.D.N.Y. Jan. 28, 2002); In re Enron Corp., Case No. 01-16034 (Bankr. S.D.N.Y.

Dec. 3, 2001); In re Ogden New York Servs., Inc., Case No. 02-40826 (Bankr. S.D.N.Y. April 1,

2002); In re Worldcom, Inc., Case No. 02-13533 (Bankr. S.D.N.Y. July 22, 2002).

**H.**      **The Debtors Should Be Authorized to Continue Performing under the**
        **Intercompany Arrangements and Historical Practices.**

        50.     The Debtors and their non-debtor affiliates and subsidiaries engage in

certain usual and customary business practices in the ordinary course of their businesses that

govern the various intercompany relationships among the Debtors and non-debtors (the

"Intercompany Arrangements").  The Debtors believe that continued performance under the

Intercompany Arrangements is not only important to the successful restructuring of the Debtors'

entities, but is absolutely integral to ensure the Debtors' ability to operate their businesses as

debtors-in-possession. Were the Debtors required to obtain the services they currently receive

under the Intercompany Arrangements on a per-company basis, aside from incurring excessive

financial burdens in identifying appropriate providers of these services and entering into

individual agreements for providing these services, the Debtors would be required to divert their

attention and efforts from ensuring a smooth transition into the chapter 11 process and,

ultimately, working towards a successful restructuring. Moreover, the services provided under

the Intercompany Arrangements are ordinary course type tasks and functions.

      51.    Thus, while the Debtors are not seeking to assume the Intercompany

Arrangements as executory contracts at this time, they respectfully request the authority to

continue performing under the Intercompany Arrangements in the ordinary course of business

without need for further Court order.[8] Courts have routinely granted such authority in other

complex multi-debtor chapter 11 cases for similar reasons. See, e.g., In re Nobex Corporation,

Case No. 05-20050 (MFW) (Bankr. D. Del., Dec. 6, 2005); In re FLYi, Inc., Case No. 05-20011

(MFW) (Bankr. D. Del. Nov. 7, 2005); In re W. R. Grace & Co., Case No. 01-1139 (Bankr. D.

Del. Apr. 2, 2001); In re Montgomery Ward Holding Corp., Case No. 97-1409 (Bankr. D. Del.

July 8, 1997); In re Mid-Valley, Inc., Case No. 03-35592 (Bankr. W.D. Pa. Dec. 17, 2003)

(interim order authorizing debtors to continue to engage in intercompany agreements in the

ordinary course of business); In re Polymer Group, Inc., Case No. 02-05773 (Bankr. D.S.C. July

---

[8] Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among similar enterprises, the Debtors believe the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, thus, do not require the Court's approval. Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a postpetition basis.

1, 2002); In re Flagstar Holdings, Inc., Case No. 97-05431-B (Bankr. D.S.C. July 15, 1997). For the reasons discussed herein, the Court should authorize the Debtors to continue to perform under the Intercompany Arrangements.

## NOTICE

52.     Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee; (ii) the Debtors' proposed postpetition lenders; (iii) the administrative agents for the Debtors' prepetition secured lenders; and (iv) the indenture trustee for the Debtors' prepetition senior subordinated notes. As the Motion is seeking "first day" relief, within two business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion as required by Del. Bankr. LR 9013-2(d). The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## NO PRIOR REQUEST

53.     No prior motion for the relief requested herein has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter an order

(i) authorizing the Debtors to (a) continue to use their existing Cash Management System,

(b) maintain existing bank accounts, (c) continue to use their existing business forms and

(d) continue to use their existing investment guidelines; and (ii) (a) granting administrative

priority status to postpetition intercompany claims and (b) authorizing the Debtors to continue to

perform under the Intercompany Arrangements; and (iii) granting such other and further relief as

the Court deems appropriate.

Dated: February 10, 2006

PACHULSKI, STANG, ZIEHL, YOUNG, JONES
& WEINTRAUB P.C.

Laura Davis Jones (Bar No. 2436)
James E. O'Neill (Bar No. 4042)
Scotta E. McFarland (Bar No. 4184)
919 North Market Street, 16th Floor
P.O. Box 8705
Wilmington, DE 19899-8705  (Courier No. 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400

and

KIRKLAND & ELLIS LLP
James H.M. Sprayregen, P.C.
Marc Kieselstein
Roger J. Higgins
Erin N. Brady
200 East Randolph Drive
Chicago, IL  60601-6636
Telephone:  (312) 861-2000
Facsimile:  (312) 861-2200

Proposed Co-Counsel for the Debtors and
Debtors-in-Possession